## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **G.D.,** *et al.* | : | **CIVIL ACTION** |
| | : | No. 17-969 |
| **v.** | : | |
| | : | |
| **WEST CHESTER AREA SCHOOL** | : | |
| **DISTRICT** | : | |

## MEMORANDUM

**KEARNEY, J.**                                                    **August 18, 2017**

Parents M.D. and K.D. sue West Chester Area School District for failing to provide special education services for their intellectually gifted child G.D. They argue G.D. has a specific reading disability because she has not made progress they believe she should have made commensurate with the abilities of an intellectually gifted child. Parents also argue G.D.'s diagnosed anxiety constitutes a disability making her eligible for special education services.

A hearing officer found for the District based on an extensive administrative record. Parents sued, and with their consent, we now consider cross-motions for judgment on the administrative record and separately consider the District's motion for summary judgment on claims not raised before the hearing officer but based on the same facts. After reviewing the administrative record and briefing, we enter the accompanying Order granting the District's motion for judgment as we find the hearing officer did not err in finding for the District under the Individuals with Disabilities Education Act ("IDEA") and Section 504 of the Rehabilitation Act ("Section 504") and the Parents did not adduce genuine issues of material fact precluding summary judgment for the District on the Americans with Disabilities Act ("ADA") claim.

## I.  Background[1]

G.D. is an eleven-year-old student diagnosed with anxiety and symptoms of obsessive compulsive disorder.[2]  On January 7, 2016, Parents removed G.D., then in third grade, from the District after being dissatisfied with its handling of G.D.'s anxiety and educational issues. Parents placed G.D. in the private Willistown Country Day School ("Willistown") for the remainder of the 2015-2016 third grade school year and for the 2016-2017 fourth grade school year.

On May 27, 2016, Parents filed an administrative due process complaint against the District with the Office of Dispute Resolution of the Pennsylvania Department of Education.[3] Parents alleged G.D. qualifies for services under IDEA[4] and Section 504[5] because of G.D.'s specific learning disability in reading and her anxiety in the school environment.[6]  Parents sought tuition reimbursement for the 2015-2016 and 2016-2017 school years spent at Willistown under IDEA.[7]

Hearing Officer William F. Culleton, Jr., Esquire held a due process hearing over four days.[8]  Hearing Officer Culleton identified four issues: (1) whether the District failed to perform its "child find" obligations under the IDEA and Section 504 during G.D.'s second and third grade years; (2) whether the District failed to offer and provide a free appropriate public education ("FAPE") during G.D.'s second and third grade years; (3) whether Willistown is an appropriate placement for G.D.; and (4) considering the equities, should the hearing officer order the District to reimburse Parents for all or any part of the tuition Parents have paid on account of G.D.'s placement in Willistown for part of the 2015-2016 school year and for the entire 2016-2017 school year.

On December 5, 2016, after considering the evidence before him and making credibility determinations based on the testimony adduced at the hearing, Hearing Officer Culleton issued his decision finding Parents failed to meet their burden of proving a violation of the District's "child find" obligations under IDEA or Section 504 and failed to meet their burden of proving the District denied G.D. a FAPE under either IDEA or Section 504.[9] Hearing Officer Culleton denied Parents' request for tuition reimbursement and dismissed the action. Because he found no deprivation of a FAPE under either the IDEA or Section 504, Hearing Officer Culleton did not reach the questions of whether Willistown is an appropriate placement and whether the equities require tuition reimbursement.[10]

Parents challenge Hearing Officer Culleton's decision the District offered and provided a FAPE to G.D. in third grade. Parents argue if G.D. is found IDEA eligible, and they suggest we should find her eligible, Westtown-Thornbury is an inappropriate placement as a matter of law because the District did not have an appropriate IEP in place to deal with her documented educational needs and anxiety. Parents argue Willistown is the appropriate placement for G.D.

Both parties filed cross-motions for judgment on the administrative record before Hearing Officer Culleton.[11] The District also moved for summary judgment on the ADA claim.

**A.    G. D. is diagnosed with anxiety and identified as intellectually gifted.**

In 2011, at four-years old, G.D. began treating with Stephanie Drabble, a clinical social worker, for anxiety.[12] On Ms. Drabble's advice and approval, Parents enrolled G.D. in public school for the 2013-2014 school year to help with her anxiety and socialization.[13] G.D. entered first grade in the Great Valley School District ("Great Valley"). Great Valley evaluated G.D. and, finding she experienced anxiety in the school environment, issued a Section 504 Service Agreement.[14]

Great Valley additionally evaluated G.D. for gifted services and issued a Gifted Individualized Education Plan ("GIEP") in reading and math.[15] G.D. adjusted well to public school but experienced some issues with "problematic behaviors during the second half of first grade."[16]

### B.    G.D. begins second grade in the District.

G.D. subsequently moved from Great Valley and into the West Chester School District. G.D. began second grade at Westtown-Thornbury Elementary School ("Westtown-Thornbury") for the 2014-2015 school year. [17] The District implemented a new Section 504 Service Agreement due to G.D.'s anxiety in school.[18]

The District tested G.D. in July 2014 before second grade.[19] Although instructed in reading at the third grade level while attending first grade, this July 2014 testing indicated reading at a second grade level.[20] A Critical Reading Inventory performed several weeks later showed G.D. reading at a fourth grade level with no areas of concern.[21] The District provided G.D. with a GIEP in second grade for reading only.[22]

Parents did not feel G.D.'s academic performance in second grade met her potential; Parents felt G.D.'s grades in Language Arts fell below what she should have achieved given receipt of gifted services.[23] G.D.'s grades in Language Arts ranged from 2 to 4, with an improvement in performance in all areas from the first to fourth quarters.[24] G.D. performed similarly in math, receiving scores between 2 and 4, and demonstrating improvement from the first to the fourth quarter.[25] Despite Parents' concerns about G.D.'s performance, G.D.'s second grade teacher did not have a concern with G.D.'s reading abilities.[26] G.D.'s Section 504 Services Agreement identified accommodations including verbal cues provided by her teacher to "slow down" on in-class work and take time on tests and quizzes, read all directions, and check work.[27]

Parents and the District disagree on G.D.'s social functioning in second grade.[28] Although Parents admit G.D.'s second grade teacher did not recall problems between G.D. and her peers and never witnessed any bullying towards her, Parents contend another student bullied and had social conflicts with G.D.[29]

### C. G.D. begins third grade in the District.

G.D. entered third grade in the District for the 2015-2016 school year.[30] The District continued to implement a Section 504 Service Agreement to address G.D.'s anxiety issues.[31] The District performed a Critical Reading Inventory in September 2015 which assessed G.D.'s reading at the third grade level with some areas assessed as "needs improvement."[32] The District placed G.D. in a grade level group for reading, but prepared a GIEP for her in math.[33]

In the first marking period of third grade, G.D. received grades ranging from a B+ to A+.[34] G.D.'s student progress report for the second marking period ranged from B to A-.[35] G.D. received a 66% on her reading benchmark assessment; 81% on her math benchmark assessment; and scored proficient on her writing benchmark assessment.[36] The progress report includes her teacher's observation G.D. is "an average to above average achiever in all subject areas," but "[G.D.] does not always take her time with her work in order to demonstrate her true ability."[37] The student progress report notes G.D. "often has conflicts with the other girls in the class and will choose to work with the boys instead."[38]

At the beginning of the school year, G.D. socialized with other girls in her class without incident.[39] By October, G.D. began having social difficulties with other students in the class.[40] On October 27, 2015, Parents contacted Lauren Leary, G.D.'s teacher, to report instances of other students bullying G.D.[41] Ms. Leary was unaware of bullying until contacted by Parents.[42]

Ms. Leary considered the instances of bullying "normal girl drama," and she agreed with an assessment by G.D.'s therapist, Ms. Drabble.[43]

Margaret Blacker, the school guidance counselor, and Nora Wheeler, the school principal, investigated the bullying allegations by interviewing G.D.'s classroom peers and two students from G.D.'s second grade class.[44] The District additionally observed G.D.'s social interaction with peers and discussed the situation with G.D. who admitted at times she participated in inappropriate behavior towards her peers.[45] The District, relying on Ms. Blaker's testimony, asserts G.D. was not the subject of bullying.[46] Ms. Blaker testified she did not believe G.D.'s difficulties constituted bullying because there were no "clearly-defined roles of bully and victim," rather, "multiple students were doing and saying things that were unkind or inappropriate," including G.D.[47]

Parents admit District investigated bullying allegations, including G.D.'s admission her behavior was sometimes inappropriate, but deny the District "effectively dealt with the situation."[48] Parents contend the District's failure to effectively handle allegations of bullying "allowed the situation at school to become so intolerable to G.D. that she had to leave" school.[49]

On November 23, 2015, Parents met with Ms. Leary, Ms. Blaker, and Ms. Wheeler to discuss solutions to the bullying problems.[50] Parents requested the District re-assign G.D. to another third grade classroom and evaluate G.D. for eligibility under IDEA.[51] The District declined to change G.D.'s classroom, concerned a move could create new problems, and instead determined it would increase observation and social skills instruction for all students in G.D.'s classroom.[52]

In early December 2015, Dr. Tammi Florio, the District's Director of Elementary Education, raised the possibility of changing G.D.'s classroom. Dr. Florio testified she made the

suggestion of a classroom change but Parents did not want a classroom change and instead wanted G.D. to have a "trusted adult" in the school.[53] Parents deny the District ever offered a classroom change, citing the hearing testimony of Ms. Leary, Ms. Blaker, and Leigh Anne Ranieri, the District's Director of Special Education, all of whom testified the District did not offer a classroom change to Parents.[54] Parents contend G.D. began exhibiting an increase in anxiety and developed headaches as a result of her classroom situation, citing mother K.D.'s testimony at the due process hearing.[55]

In addition to a classroom change, Parents also requested the District evaluate G.D. for IDEA eligibility. On December 3, 2015, K.D. requested an evaluation for special education services, concerned G.D. had not made the academic progress they believed she should; G.D. may have a masked learning disability; and G.D.'s increasing anxiety.[56] In response, the District scheduled the first day of its IDEA eligibility evaluation of G.D. on December 17, 2015.[57] On the day of the testing, Ms. Wheeler and Ms. Blaker "pull[ed] G.D. out" of testing to question her about an instance of peer conflict.[58] Parents contend G.D. became upset and cried during her meeting with Ms. Wheeler and Ms. Blaker, and the two administrators then sent G.D. back to the testing, with Ms. Wheeler telling G.D. "she could speak to her therapist about the situation."[59] Parents contend Ms. Blaker and Ms. Wheeler "failed to appreciate how mentioning G.D.'s mental health therapist was deeply hurtful and stigmatizing to her."[60]

The District denies Ms. Wheeler made this comment, and points to the hearing testimony of Peggy Katsouros, school psychologist, who conducted the December 17 testing.[61] Ms. Katsouros testified after G.D. returned from Ms. Wheeler's office, Ms. Katsouros offered G.D. the option of testing on another day.[62] Ms. Katouros testified G.D. decided to stay and proceed with testing; if Ms. Katsouros saw any sign the testing results would be invalid, or of stress, she

would discontinue the testing; Ms. Katsouros did not see any signs of stress; G.D. appeared "very happy"; the two built a rapport quickly; and once Ms. Katsouros felt G.D. was comfortable with her, she began testing.[63]

Later in the day on December 17, after G.D.'s meeting with Ms. Wheeler and Ms. Blaker and after testing, G.D. met with her therapist, Ms. Drabble.[64] Ms. Drabble testified G.D., accompanied by her father, "was so distraught that day that I wasn't really able to do therapy . . . ."[65] Ms. Drabble's progress notes from December 17, 2015 reflect G.D. "in tears today bc [sic] during the psycho-education testing she was taken out to talk with the principal who apparently caught her in a lie. G crying with principal and sent back to testing."[66] The progress notes also reflect G.D. "feeling a lot of social anxiety."[67]

At Ms. Drabble's direction, G.D. and her father, M.D., completed a Multidisciplinary Anxiety Scale for Children ("MASC-2") assessment on December 23, 2015.[68] G.D.'s self-reported responses resulted in an overall anxiety symptom score in the "High Average" range showing "[c]linically elevated subscale scores includ[ing]: generalized anxiety, panic symptoms and tense/restless."[69] M.D.'s self-reported responses to the MASC-2 resulted in an overall anxiety score in the "Very Elevated" range showing "[c]linically elevated subscale scores includ[ing]: generalized anxiety, social anxiety, humiliation/rejection, performance fears, obsessions & compulsions, physical symptoms and tense/restless."[70]

By December 2015, Ms. Leary described the classroom situation as "intense."[71] Parents contend by mid-December, G.D. could no longer attend school at Westtown-Thornbury.[72] On December 22, 2015, Parents and Ms. Drabble met with Ms. Wheeler and Dr. Florio.[73] Parents contend Ms. Drabble told Ms. Wheeler and Dr. Florio the District's actions caused G.D.'s behavior to significantly regress and her condition so deteriorated Ms. Drabble would

recommend G.D. be prescribed anxiety medication.[74]  The District admits a meeting took place on December 22, but points to Dr. Florio's hearing testimony, and her contemporaneous notes of the meeting, denying Ms. Drabble made such statements.[75]

Parents contend the District never contacted them after the December 22, 2015 meeting with a proposal or solution to G.D.'s "placement issue" or to revise her Section 504 Service Agreement.[76]  Although District denies this contention, Ms. Blaker testified she did not feel it necessary to "call a 504 meeting."[77]  The District ultimately revised G.D.'s Section 504 Services Agreement signed by K.D. on March 17, 2016.[78]

### D.    Parents place G.D. at Willistown in the middle of third grade.

On January 4, 2016, Ms. Drabble wrote a letter providing her opinion Westtown-Thornbury "is an unhealthy environment" for G.D.; it would be against her advice to expect G.D. to return to Westtown-Thornbury; and Willistown is a "better environment" for G.D. to finish third grade.[79] On January 7, 2016, Parents sent a letter to the District advising they removed G.D. from the District, placed her at Willistown, and of their intent to seek tuition reimbursement.[80]

Upon arrival at Willistown in January 2016, G.D. exhibited symptoms of anxiety and had socialization issues with peers in her class, manifested through heightened competitiveness and rushing through her work.[81] G.D.'s issues with peer relationships are noted both in her March and June 2016 progress report from Willistown.[82]  Academically, G.D.'s teacher testified "she was making progress."[83]  During the rest of her third grade year, G.D. worked on the 9 to 12 curriculum, which correlates to the age of the student, not grade level.[84] G.D.'s progress report for the 2015-2016 school year shows she required support for reading comprehension but G.D. received "progressing" or "secure" in all other areas of language arts.[85]  The report card also shows G.D. received "progressing" or "secure" in all areas of math.[86]

G.D. began the 2016-2017 school year in fourth grade at Willistown. G.D.'s teacher testified G.D. performed well academically and still exhibited anxiety symptoms but had been doing well with socialization.[87] G.D.'s teacher testified G.D. had not had any formal reading comprehension testing.[88] G.D.'s teacher also testified the reading instruction G.D. received did not necessarily correlated to a grade level—for example, fourth or fifth grade level—rather the core curriculum written by the American Montessori Society correlated to age—9 to 12, which G.D. received instruction in as well as reading remediation during the 2016-2017 school year.[89]

G.D.'s report card for November 2016 and March 2017 show she is "progressing" in reading comprehension and "progressing" or "secure" in all other parts of reading.[90] G.D. received "support required" for some categories of writing but generally received "progressing" or "secure" in all other areas of language arts.[91] G.D. received "progressing" or "secure" in all areas of math.[92] G.D.'s progress report also notes her propensity to rush through her work.[93]

**E.   District completed its evaluation in January 2016 and revised G.D.'s Section 504 Service Agreement in March 2016.**

On January 28, 2016, after Parents removed G.D. from the District's Westtown-Thornbury, the District issued its Evaluation Report performed by Ms. Katsouros.[94] Ms. Katsouros testified she considered all the assessment results contained in the Evaluation Report and none indicated G.D. read below grade level.[95] The Evaluation Report concluded G.D. did not have a disability and is not eligible for special education services.[96] The District provided Parents with written notice of its decision denying special education services: "[t]his option was rejected because [G.D.] does not require special education support to access Free Appropriate Public Education (FAPE)."[97] Parents rejected the recommendation: "[w]e believe that our daughter is eligible for IDEA services due to her challenges in reading, and due to her

anxiety/mental health. Our daughter cannot presently attend school in the District due to her anxiety/mental health."[98]  Parents demanded a due process hearing.

Although the District's Evaluation Report did not find a disability, it concluded a Section 504 Services Agreement should continue "to address the modest impairment of peer relationships and the worry over her performance" as well as a GIEP in math.[99]  On March 4, 2016, the District revised G.D.'s Section 504 Service Agreement to include additional accommodations, including a transition plan for G.D.'s return to the District.[100]  K.D. agreed to the revised Section 504 Services Agreement and signed it on March 17, 2016.[101]  G.D. did not return to the District; she remained at Willistown.

Family filed a due process hearing with the Office of Dispute Resolution on May 27, 2016 seeking tuition reimbursement for the 2015-2016 and 2016-2017 school years.

**F.    Earlier litigation between the District and Family.**

After the District completed its Evaluation Report in January 2016, Parents requested an independent educational evaluation ("IEE") at public expense in the area of reading.   The District declined to pay for the IEE and filed a complaint for a due process hearing.

After a due process hearing, Hearing Officer Jake McElligott issued a decision on June 14, 2016 ordering the District to provide an IEE, in the form of an independent reading evaluation, at public expense.  On August 11, 2016, the District filed an appeal to this Court from Hearing Officer McElligott's June 14, 2016 ("Earlier Action").[102]

On August 12, 2016, reading specialist Martha J. Biery, M.Ed. conducted the IEE ordered by Hearing Officer McElligott and prepared a Reading Skills Analysis report of G.D.[103]  Ms. Biery's report is contained in the administrative record before Hearing Officer Culleton on Parents' due process complaint challenging the District's conclusion G.D. is not eligible for

services under IDEA. On January 25, 2017, we denied the District's motion for judgment on the administrative record.[104] We specifically limited our review solely to the propriety of Hearing Officer McElligott's decision requiring the District to pay for the IEE.[105]

## II.     Analysis

When considering Parents' appeal from Hearing Officer Culleton's decision, we apply a "nontraditional standard of review, sometimes referred to as 'modified de novo' review," giving "due weight" to the Hearing Officer's decision.[106] Under this standard, "[f]actual findings from the administrative proceedings are to be considered prima facie correct," and, if we reject the factual findings, we must explain our reasons for doing so.[107] We are cautioned by our court of appeals the "due weight" standard prevents us from "imposing [our] own view of preferable educational methods on the states."[108] We review Hearing Officer Culleton's legal conclusions under the *de novo* standard.[109]

We must accept credibility determinations made by Hearing Officer Culleton "unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion."[110] Hearing Officer Culleton's credibility determinations are given "special weight" where, as here, he heard and considered live testimony from multiple witnesses and determined some witnesses are more credible than other witnesses.[111]

As the party challenging Hearing Officer Culleton's decision, Parents bear the "burden of persuasion . . . as to each claim challenged."[112] "In evaluating the arguments of the party challenging the Hearing Officer's findings, the district court must base its decision on the preponderance of the evidence."[113]

Family moves for judgment on the administrative record, challenging Hearing Officer Culleton's decision for the following reasons: (1) Hearing Officer Culleton's decision is based on Ms. Katsouros's Evaluation Record which we found in the Earlier Action to be "legally improper" and Ms. Katsouros's Evaluation Record is "legally deficient"; (2) Westtown-Thornbury is an inappropriate placement as a matter of law; (3) Willistown is an appropriate placement for G.D.; and (4) the equities weigh in their favor.

The District moves for judgment on the administrative record, arguing Hearing Officer Culleton correctly found: (1) the District did not fail to perform its "child find" duties under the IDEA and Section 504; (2) G.D. is not eligible for special education services under the IDEA; (3) the District provided G.D. with a FAPE for the 2015-2016 and 2016-2017 school years, accordingly tuition reimbursement is not warranted. The District additionally moves for summary judgment on Family's claim under the ADA.

### A. The IDEA framework.

The IDEA "protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children, or pay for their education elsewhere if they require specialized services that the public institution cannot provide."[114] Under the IDEA, the "school must (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students."[115]

The IDEA's "child find" requirement imposes upon school districts "a continuing obligation under the IDEA . . . to identify and evaluate all students who are reasonably suspected of having a disability."[116] Section 504 imposes the same "child find" requirement.[117] The District's "child find" obligation "extends to children 'who are suspected of [having] . . . a

disability . . . and in need of special education, even though they are advancing from grade to grade."[118]

Both the IDEA and Section 504 require states to provide every disabled child a "free appropriate public education," or FAPE.[119] "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[120] The state, through the school district, "is not required to maximize the potential of every handicapped child," but "it must supply an education that provides 'significant learning' and 'meaningful benefit' to the child."[121]

### B. Hearing Officer Culleton correctly found the District provided an appropriate placement in third grade.

Parents challenge Hearing Officer Culleton's decision G.D. is not disabled under IDEA.[122] Parents argue Hearing Officer Culleton improperly relied on the District's January 2016 Evaluation Report prepared by Ms. Katsouros because (a) in the Earlier Action we found the Evaluation Report "legally improper" and any finding the Evaluation Report is proper is barred by res judicata, and (b) the Evaluation Report is "legally deficient."

Addressing each argument, we find the record amply supports the Hearing Officer's findings the District appropriately evaluated G.D. and found her ineligible for special education services under the IDEA.

### 1. Res judicata does not apply to the merits of the Evaluation Report.

Parents argue Ms. Katsouros's Evaluation Report "has been called into question as a matter of law due to the unique procedural posture of this case." We disagree. Hearing Officer Culleton issued his decision on December 5, 2016. At that time, the Earlier Action—the District's appeal from Hearing Officer McElligott's decision regarding payment for an

independent educational evaluation—remained pending. On January 25, 2017, we found Hearing Officer McElligott correctly ordered the District to pay for the IEE. Parents contend our January 25, 2017 decision operates as *res judicata* on the merits of the District's Evaluation Report.

Res judicata, or claim preclusion, "gives dispositive effect to a prior judgment if a particular issue, although not litigated could have been raised in the earlier proceeding. Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities [sic]; and (3) a subsequent suit based on the same cause of action."[123]

We confined our January 25, 2017 decision to resolving the question of whether Hearing Officer McElligott erred in requiring the District to pay for an independent educational evaluation.[124] Hearing Officer McElligott found a problem in the District's evaluative methodology, finding "some degree of doubt about the conclusion in the District's January 2016 ER that the student does not have a specific learning disability in reading" and accordingly ordered an independent educational evaluation at public expense to complete a fulsome evaluation.[125]

Neither Hearing Officer McElligott nor this Court ruled on the substantive merits of the Evaluation Report.[126] We specifically refused address the merits of the Evaluation Report, including the District's argument the later-acquired independent educational evaluation supports its Evaluation Report. In response, Parents argued the distinction between the "disposition phase" of the evaluation process and Hearing Officer McElligott's decision "directed to the 'acquisition' phase" of the evaluation process.[127] Our decision in the Earlier Action is not a "final judgment on the merits" and res judicata does not apply.

## 2. The record amply supports the decision G.D. is not eligible for IDEA services and the District offered and provided her with a FAPE.

Challenging the result of the District's Evaluation Report, Parents contend G.D. is IDEA eligible. Parents attribute error to Hearing Officer Culleton's reliance on the District's Evaluation Report performed by Ms. Katsouros, characterizing it as "legally deficient due to the limited nature of her inquiry." Parents point to the following deficiencies in the Evaluation Report: Ms. Katsouros never obtained Ms. Drabble's treatment records or considered Ms. Drabble's January 4, 2016 letter; Ms. Katsouros did not discuss with the District's reading specialists G.D.'s Critical Reading Inventory results showing regression; Martha Biery's IEE is missing from the Evaluation Report; Ms. Katsouros failed to address how she could find G.D. ineligible for IDEA services when G.D. could not attend school for mental health reasons.

We apply the modified *de novo* standard of review to Hearing Officer Culleton's decision and consider his factual findings *prima facie* correct. Hearing Officer Culleton made extensive factual findings on Ms. Katsouros's Evaluation Report as well as all the other evidence before him. Hearing Officer Culleton rejected Parents' challenge to the Evaluation Report addressing Ms. Katsouros's failure to consider Ms. Drabble's treatment notes and January 4, 2016 letter. He provided reasons why he rejected their argument: the law does not "require review of a therapist's notes for an evaluation of Student's need for special education and accommodations, when notes have not been provided by Parent for that purpose"; there is no "preponderant evidence such a review would have led to information contrary to the ultimate result of the evaluation – that G.D. is not IDEA eligible, and that the District should continue to provide Student with a Section 504 service agreement and regular education placement"; and concluded

"the evidence does not show that the psychologist's [Ms. Katsouros] omission to review these documents had any detrimental effect on the reliability of her conclusions."[128]

Scrutiny of the record confirms Ms. Katsouros testified she spoke with Ms. Drabble on January 12, 2016 before she issued the Evaluation Report. Ms. Katsouros testified Ms. Drabble did not tell her G.D. could not return to Westtown-Thornbury and instead told her G.D. "is able to hold it together at school and the behaviors are displayed at home."[129] Hearing Officer Culleton made the required credibility determinations in reaching his finding regarding Ms. Katsouros's Evaluation Report to which we accord "special weight."[130]

Hearing Officer Culleton rejected Parents' argument Ms. Katsouros failed to consider the two Critical Reading Inventory results explaining "the record showed preponderantly that these two assessments did not show regression in reading as Parents assert" and "again, there is not preponderant evidence that the psychologists' [sic] omission to consider these curriculum based assessments undercut the validity of her findings that there is not a specific learning disability as defined in the IDEA."[131]

Our review of the record confirms the District's reading specialist, Kathryn McGill, testified regarding the two Critical Reading Inventory results administered in 2014 and 2015. The 2015 inventory resulted in more areas scoring "needs improvement" than the inventory conducted in 2014. Parents argue this facts evidences G.D.'s regression in reading and attribute fault to Ms. Katsouros's failure to consider them. Ms. McGill testified she could not conclude the 2015 inventory showed regression, as it is "just one assessment" and "we don't use one assessment to make any determination of reading level."[132] Again, Hearing Officer Culleton made credibility determinations regarding testimony from the District's witnesses.

Hearing Officer Culleton rejected Parents' argument Ms. Katsouros failed to consider "Other Health Impairment" because G.D.'s therapist recommended against her return to school due to anxiety. Hearing Officer Culleton explained "[Ms. Katsouros] in fact did consider the heart of the therapist's basis for recommending against return to school, and the evaluation is not undercut because [Ms. Katsouros] reached a different conclusion."[133]

Parents additionally complain Ms. Biery's IEE is not included in Ms. Katsouros's Evaluation Report. Ms. Biery conducted the IEE in August 2016, seven months after Ms. Katsouros's Evaluation Report and could not have been included. Even if Ms. Biery's IEE could have been included in the Evaluation Report, Ms. Biery did not find G.D. has a specific learning disability in reading.[134] Ms. Biery testified at the due process hearing. Hearing Officer Culleton considered all testimony and made credibility determinations. Parents fail to adequately explain why we should reject Hearing Officer Culleton's factual findings or his credibility determinations.

### C. We enter summary judgment in favor of the District on the ADA claim.

Parents also allege the District's same conduct violates Section 504 and the ADA, arguing G.D. is disabled because of her mental health condition. The Hearing Officer, while analyzing the same conduct, did not decide whether the District violated the ADA. In reviewing the District's summary judgment motion, we are guided by the well-established standards for summary judgment and do not apply the modified *de novo* review of the Hearing Officer's decision under IDEA and Section 504.

Family's ADA claim alleges G.D. is "disabled for Section 504 and ADA purposes due to her mental health condition"; G.D. is "otherwise qualified to participate in the educational program offered at Westtown-Thornbury"; and "by failing to adequately and timely deal with

and/or accommodate G.D.'s mental health issues in the school environment, the District deprived G.D. of the benefits of its program and/or subjected her to discrimination."[135]

Family does not cite a specific section of the ADA on which they base their claim. Section 202 of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.[136]

Section 202 of the ADA "extends the nondiscrimination rule of section 504 of the Rehabilitation Act to services provided by any 'public entity.'"[137] The "'remedies, procedures and rights' under the ADA are the same as those under Section 504" and the "two claims are treated as analogous."[138]

In this circuit, "a showing of deliberate indifference may satisfy a claim for compensatory damages under § 504 of the [Rehabilitation Act] and § 202 of the ADA."[139] To satisfy the deliberate indifference standard, Parents must show both "(1) *knowledge* that a federally protected right is substantially likely to be violated . . . , and (2) *failure to act* despite that knowledge."[140]

The District moved for summary judgment on the ADA claim. In response, and for the first time, Parents argue they should be allowed to conduct discovery on the "newly filed" Section 504 and ADA claims so "they can develop a record on the deliberate indifference issue before facing a Summary Judgment Motion." We deny Parents' request "they should be allowed to conduct discovery" before ruling on the ADA claim under a summary judgment standard. Parents' opposition fails to comply with Rule 56(d) requiring a non-movant to show by affidavit or declaration "that, for specified reasons, it cannot present facts essential to justify its opposition."[141] In their opposition, Parents do not articulate the discovery needed for their

ADA claim and present no argument regarding separate liability under Section 504.[142]   The record shows Parents had the opportunity to question numerous District witnesses during the due process hearing.   Parents do not explain why they need additional discovery after having examined witnesses and relevant documents over their four-day hearing.   Parents could have asked for discovery and elected not to.   Instead, they agreed to a schedule allowing them to adduce evidence but did not ask for more discovery.[143]   The Parents understandably cannot articulate the additional discovery they would need in any event.   Instead, they cite evidence the District acted with "deliberate indifference" arguing the District's administrative personnel "all knew they had an obligation under Section 504 to provide G.D. with FAPE," and point to testimony of Ms. Blaker, Dr. Ranieri, and Dr. Florio.

Upon reviewing the evidence and construing any disputes in favor of the Family, we find no genuine issues of material fact as to deliberate indifference precluding entry of summary judgment for the District on the ADA claim.   Parents wanted G.D.'s classroom changed in November 2015; at first the District declined because it anticipated possible adverse consequences and because it believed it could institute different accommodations to ameliorate G.D.'s anxiety; and the District instituted a number of accommodations but Parents remained unsatisfied.[144]   It is undisputed the District revised G.D.'s Section 504 Service Agreement in March 2016 to provide additional accommodations including a transition plan for G.D.'s return to the District.[145]

Family adduces no evidence the District had (1) knowledge a federally protected right is substantially likely to be violated, and (2) failed to act despite that knowledge. All of the evidence is to the contrary.   Setting aside, for these purposes only, the IDEA and Section 504 findings in favor of the District and now upheld on a modified *de novo* standard, we find no

evidentiary basis the District failed to act and thus deprived rights under the ADA. Absent a genuine issue of material fact, we enter summary judgment in favor of the District on the ADA claim.

### III.     Conclusion

G.D. and her parents have not shown a basis to disturb the Hearing Officer's detailed findings under IDEA and Section 504 based on an extensive administrative record and after evaluating the credibility of several witnesses. The Family disagrees with the Hearing Officer. This disagreement is not enough under the Law. Under our summary judgment standard, we also cannot find a disputed genuine issue of material fact as to the District's alleged deliberate indifference and must enter summary judgment for the District on the ADA claim. We grant the District's motion for judgment on the administrative record and summary judgment in the accompanying Order.

---

[1] Our Policies require a Statement of Undisputed Material Facts ("SUMF") and an appendix in support of summary judgment. The parties submitted the supplemented administrative record as the Joint Appendix (ECF Doc. No. 18). References to the Joint Appendix ("JA") shall be by Bates number, for example, "JA 1." The District filed its SUMF at ECF Doc. No. 16-1 ("District SUMF"). G.D. and her parents (collectively "Family") responded at ECF Doc. No. 22-3 ("Family Response to SUMF"). Family submitted their SUMF at ECF Doc. No. 17-3 ("Family SUMF"). District responded at ECF Doc. No. 21-2 ("District Response to SUMF").

[2] JA 535, 890. At the time of the complaint in March 2017, G.D. attended fourth grade. G.D. completed fourth grade in June 2017. District SUMF at ¶ 55; Family Response to SUMF at ¶ 55.

[3] JA 1-6.

[4] 20 U.S.C. § 1400 *et seq.*

[5] 29 U.S.C. § 794.

[6] JA 4.

[7] JA 6.

[8] JA 1978.

[9] JA 1978-2003. Hearing Officer Culleton's decision and order include Findings of Fact ("FOF"), with reference to Notes of Testimony (N.T.) included in the administrative record at JA 1021-1977).

[10] JA 2002-2003.

[11] We granted Family's motion for leave to supplement the administrative record with G.D.'s 2016-2017 year-end report card from Willistown. *See* June 16, 2017 Order-Memorandum (ECF Doc. No. 19).  Family never asked for discovery.

[12] Family SUMF at ¶ 2. In 2016, G.D. began treatment with Tamar Chansky, Ph.D., a psychologist. Family SUMF at ¶ 4.

[13] Family SUMF at ¶ 5.

[14] Family SUMF at ¶ 8. The Pennsylvania Department of Education's website explains a 504 Service Agreement may be applicable where:

> A student that does not qualify for special education services under IDEA (an educational law) still may qualify for services under Section 504 (a civil rights law) if the disability is shown to substantially limit his or her educational performance.
>
> A child with a disability is one who has a physical or mental impairment that substantially limits major life activities, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working. Accommodations often refer to building accessibility, classroom adjustments and curriculum modifications and may be updated or revised as the need changes.

*See* *http://www.education.pa.gov/K-12/Homebound%20Instruction/Pages/IEPs-and-504-Service-Agreements.aspx*.  Both the federal Rehabilitation Act and Pennsylvania's regulations provide conditions for a 504 plan.

[15] Family SUMF at ¶ 7.

[16] FOF at ¶¶ 9, 13.

[17] Family SUMF at ¶ 10.

[18] Family SUMF at ¶ 13; District SUMF at ¶ 7.

[19] Family SUMF at ¶ 11.

[20] Family SUMF at ¶ 11.

[21] Family SUMF at ¶ 11. The District admits it performed testing, but denies "one testing assessment can properly determine a reading level." District Response to SUMF at ¶ 11.

[22] Family SUMF at ¶ 12.

[23] JA 1085 (N.T. 65); F.F. ¶ 23.

[24] *See* 2014-2015 report card at JA 495-496. According to the report card, a score of 2 is "Basic" performance defined as: "[t]he student's performance demonstrates progress toward meeting the standard as required for the grade level." A score of 2+ also constitutes "Basic" performance defined as: "[t]he student's performance demonstrates significant progress toward meeting the standard as required for the grade level." A score of 3 is "Proficient" performance defined as: "[t]he student's performance consistently meets the standard as required for the grade level." A score of 4 is "Advanced" performance defined as: "[t]he student's performance consistently exceeds the standard as required for the grade level." JA 495.

[25] *Id.*

[26] N.T. 173 at JA 1193.

[27] J.A. 18-21.

[28] District SUMF at ¶ 12; Family's response to SUMF at ¶ 12.

[29] District SUMF at ¶¶ 9-12; Family's response to SUMF at ¶¶ 9-12. Family points to an October 2015 email sent by G.D.'s mother to G.D.'s third grade teacher, referring to problems with a particular student beginning in second grade. *See* JA 156 and mother's testimony at JA 1082-1084.

[30] Family SUMF at ¶ 14.

[31] Family SUMF at ¶ 17; District SUMF at ¶¶ 15-16.

[32] Family SUMF at ¶ 15; September 2015 Critical Reading Inventory at JA 930. The District admits it conducted a Critical Reading Inventory in September 2015, but denies one test "can properly determine a reading level." District response to SUMF at ¶ 15.

[33] Family SUMF at ¶ 16.

[34] JA 499. G.D. received: 93 (A) in math; 90 (A-) in reading; 89 (B+) in writing; 93(A) in science; and 97 (A+) in social studies.  In the beginning of third grade, G.D.'s teacher instructed her at the "end of third grade reading level." N.T. 214 at JA 1234.

[35] JA 502. G.D. received a 90 (A-) in reading; 90 (A-) in writing; and 86 (B) in social studies. *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] District SUMF at ¶ 19.

[40] District SUMF at ¶ 20.  G.D.'s issues involved the same girl with whom G.D. conflicted in second grade. N.T. 193 at JA 1213. G.D.'s third grade teacher noted only having seven girls in a class created a "challenging" social dynamic among the girls. N.T. 194 at JA 1214.

[41] District SUMF at ¶ 21.

[42] District SUMF at ¶ 22.

[43] District SUMF at ¶ 23.

[44] District SUMF at ¶ 24.

[45] District SUMF at ¶ 25.

[46] District SUMF at ¶ 28.

[47] District SUMF at ¶ 28; N.T. at 1422-1423.

[48] Family response to SUMF at ¶¶ 24-26.

[49] Family response to SUMF at ¶¶ 24-28.

[50] Family SUMF at ¶ 18; District SUMF at ¶ 29.

[51] Family SUMF at ¶ 19; District SUMF at ¶ 30.

[52] District SUMF at ¶ 31.

[53] N.T. 551-554 at JA 1605-1608.

[54] Family response to SUMF at ¶ 32.

[55] Family SUMF at ¶ 26.  The District denies Family's contention, arguing G.D. did not exhibit behavior concerns in school to the same extend or degree as Parents reported G.D.'s behavior at home. District response to SUMF at ¶ 26.

[56] JA 74-77.

[57] Family SUMF at ¶ 27.

[58] Family SUMF at ¶ 27; District response to SUMF at ¶ 27.

[59] Family SUMF at ¶ 27. District denies Ms. Wheeler told G.D. she "could speak to her therapist about the situation."  District response to SUMF at ¶¶ 27, 29.

[60] Family SUMF at ¶ 29.

[61] District response to SUMF at ¶ 27.

[62] N.T. 451-452 at JA 1505-1506.

[63] *Id.*

[64] Family SUMF at ¶ 31.

[65] N.T. 706 at JA 1807.

[66] JA 727.

[67] *Id.*

[68] Family SUMF at ¶ 32.

[69] JA 732.

[70] *Id.*

[71] Family SUMF at ¶ 25; District response to SUMF at ¶ 25.

[72] Family SUMF at ¶ 33. District denies this contention.

[73] Family SUMF at ¶ 34.

[74] Family SUMF at ¶ 34.

[75] District response to SUMF at ¶ 34; N.T. 557-558 at JA 1611-1612; JA 950-952.

[76] Family SUMF at ¶ 35.

[77] N.T. 295-297 at JA 1314-1316.

[78] District response to SUMF at ¶ 35; JA 24-25.

[79] JA 12. District SUMF at ¶ 33.

[80] Family SUMF at ¶ 37; JA 10-11.

[81] N.T. 626-629, 664 at JA 1710-1713, 1748.

[82] JA 503-505.

[83] N.T. 631-632 at JA 1715-1716.

[84] N.T. 642 at JA 1726. Willistown's students are grouped by ability, not by traditional grade level classrooms. JA 1727. Upon transfer to Willistown in the 2015-2016 school year, and during the 2016-2017 school year, G.D. worked in the nine to 12-year old curriculum. JA 1725-26.

[85] JA 503-505.

[86] *Id.*

[87] N.T. 670-672 at JA 1754-1756.

[88] N.T. 679 at JA 1763.

[89] N.T. 685-686 at JA 1769-1770.

[90] JA 2004-2005.

[91] *Id.*

[92] *Id.*

[93] *Id.*

[94] District SUMF at ¶ 40; JA 78-104.

[95] District SUMF at 44; N.T. 467 at JA 1521.

[96] JA 99.

[97] JA 105-107.

[98] JA 107.

[99] JA 101.

[100] JA 24-26.

[101] JA 25.

[102] *West Chester Area Sch. Dist. v. G.D., et al.*, No. 16-4471.

[103] JA 1014-1020.

[104] *West Chester Area Sch. Dist.,* No. 16-4471 at ECF Doc. No. 35.

[105] *West Chester Area Sch. Dist. v. G.D., et al.*, No. 16-4471, 2017 WL 379440, at *1, *6-*7 (E.D. Pa. Jan. 25, 2017).

[106] *H.L. v. Downingtown Area Sch. Dist.*, 624 F. App'x 64, 67 (3d Cir. 2015) (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 564 (3d Cir. 2010)).

[107] *Shore Regional High Sch. Bd. of Educ. v. P.S. ex rel. P.S.,* 381 F.3d 194, 199 (3d Cir. 2004) (quoting *S.H. v. State–Operated School Dist. of City of Newark*, 336 F.3d 260, 271 (3d Cir. 2003)).

[108] *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 565 (3d Cir. 2010) (citing *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 2019 (3d Cir. 1993)).

[109] *S.H.*, 336 F.3d at 270.

[110] *D.S.*, 602 F.3d at 564 (quoting *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir. 1995)).

[111] *Id.* (citing *Shore Regional High Sch. Bd. of Educ.*, 381 F.3d at 199)).

[112] *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir 2012) (footnote omitted).

[113] *Sch. Dist. of Philadelphia v. Post*, No. 15-4501, 2017 WL 2879684, at *5 (E.D.Pa. July 5, 2017) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).

[114] *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012) (quoting *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 735 (3d Cir. 2009).

[115] *D.K.*, 696 F.3d at 244.

[116] *Ridley Sch. Dist.*, 680 F.3d at 271 (quoting *P.P.*, 585 F.3d at 738); *see* 34 C.F.R. § 300.111 (federal "child find" regulations) and 22 Pa. Code §§ 14.121 – 14.125 (Pennsylvania "child find" regulations).

[117] *P.P.*, 585 F.3d at 738.

[118] *D.K.*, 696 F.3d at 249 (quoting 34 C.F.R. § 300.111(c)(1)).

[119] 20 U.S.C. 1412. *See Lauren G. ex rel. Scott G. v. West Chester Area Sch. Dist.*, 906 F. Supp. 2d 375, 388 (E.D. Pa. 2012) ("The Third Circuit has 'held that there are few differences, if any, between IDEA's affirmative duty and § 504's negative prohibition and have noted that the regulations implementing § 504 require that the school districts provide a free and appropriate public education to each qualified handicapped person in its jurisdiction.'" (quoting *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.,* 172 F.3d 238, 253 (3d Cir.1999)).

[120] *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, __ U.S. ___, 137 S.Ct. 988, 999 (2017).

[121] *Ridley Sch. Dist.*, 680 F.3d at 269 (citing *D.S.*, 602 F.3d at 556)).

[122] Hearing Officer Culleton recognized G.D. is disabled under 504 and the District provided a Section 504 Service Agreement. JA 1979.

[123] *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 276 (3d Cir. 2014) (quoting *Bd. of Trs. of Trucking Emps. of N. Jersey Welfare Fund, Inc. - Pension Fund v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992)).

[124] *West Chester Area Sch. Dist. v. G.D.*, No. 16-4471, 2017 WL 379440, at *1, *6–*7 (E.D. Pa. Jan. 25, 2017).

[125] *Id.* at *6.

[126] We affirmed Hearing Officer McElligott only as to his decision ordering the District to pay for an independent educational evaluation explaining, "To fully develop and inform a more complete understanding of Student's potential learning disability, Hearing Officer McElligott used his wisdom and experience, in conjunction with the District's ER, to find the District's inadequate methodology resulted in an inability to fully understand Student's ability versus achievement in the area of reading requiring an IEE." *Id.*

[127] *West Chester Area Sch. Dist. v. G.D.*, No. 16-4471 at ECF Doc. No. 27, p. 14.

[128] JA 2000-2001.

[129] N.T. 457 at JA 1511.

[130] JA 1989-1992.

[131] JA 2001.

[132] N.T. 405 at JA 1459.

[133] JA 2001.

[134] JA 1014-1020.

[135] Complaint at ¶¶ 64–66 (ECF Doc. No. 1).

[136] 42 U.S.C. § 12132; *S.H.*, 729 F.3d at 260.

[137] *Jeremy H. v. Mount Lebanon Sch. Di*st., 95 F.3d 272, 279 (3d Cir. 1996).

[138] *T.M. on behalf of T.M. v. Quakertown Cmty. Sch. Dist.*, No. 16-3915, 2017 WL 1406581, at *14 (E.D.Pa. Apr. 19, 2017) (*citing* 42 U.S.C. § 12133; *Jeremy H. v. Mount Lebanon Sch. Dist.*, 95 F.3d 272, 279 (3d Cir. 1996); *Travis G. v. New Hope–Solebury Sch. Dist*., 544 F.Supp.2d 435, 445 (E.D. Pa. 2008)).

[139] *S.H.*, 729 F.3d at 263.

[140] *Id.*, 729 F.3d at 265 (emphasis in original) (citation omitted).

[141] Fed. R. Civ. P. 56(d).

[142] Parents never requested additional discovery beyond the administrative record on their ADA claim despite filing a joint proposed briefing schedule and never raised the issue during our conference call with counsel regarding the proposed briefing schedule.

[143] ECF Doc. No. 8.

[144] JA 2001–2002.

[145] JA 24.